IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GIFTA MONERO

v. : Civil Action No. DKC 25-4285

BROWN, PARKER, DEMARINIS ADVERTISING

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this race discrimination case is the motion to dismiss for failure to state a claim filed by Brown, Parker, DeMarinis Advertising, LLC ("BPD" or "Defendant"). (ECF No. 4). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

## I. Background

### A. Factual Background[1]

Gifta Monero ("Ms. Monero" or "Plaintiff") is a Black woman who has almost twenty years of experience "in digital media, including paid search, paid social media advertising, search engine optimization ('SEO') and digital and programmatic tactics." (ECF No. 1 ¶ 12). Prior to her employment with BPD, Ms. Monero

[1] The facts herein are set forth in the complaint and construed in the light most favorable to Plaintiff.

worked at Zimmerman Advertising, where she directly supervised up to ten individuals and oversaw a $75 million budget. (*Id.* ¶ 13).

In October 2023, Josh Donaghue ("Mr. Donaghue"), a White male Vice President ("VP") at BPD, recruited Ms. Monero to join BPD's digital media team. (*Id.*). At the time, the VP of Digital Media role was open, and Mr. Donaghue was searching for a person to fill the role. (*Id.* ¶ 14). The VP of Digital Media supervises roughly six people and manages a budget of up to $10 million. (*Id.* ¶ 15). The former VP of Digital Media, a White man named Matthew Lorton ("Mr. Lorton"), had been terminated in February 2023 after "repeatedly engag[ing] in sexual misconduct and drunk and disorderly conduct in front of coworkers and clients." (*Id.* ¶¶ 36, 44). He had also previously embroiled a client in litigation due to poor advice. (*Id.* ¶ 37).

Ms. Monero alleges that the VP of Digital Media role resembled positions she had previously held and that she was qualified for it. (*Id.* ¶¶ 15–16). Nevertheless, Mr. Donaghue offered Ms. Monero the Assistant Vice President ("AVP") of Paid Search role, which was below the VP. (*Id.* ¶ 17). Mr. Donaghue "represented that BPD would promote Ms. Monero to a VP role if she successfully provided coverage and leadership for the Paid Social Media team while several of their team members were on leave during Winter 2023 and Spring 2024." (*Id.* ¶ 18). Based on this representation, Ms.

Monero accepted the offer for the AVP position and began working for BPD on November 30, 2023. (*Id.* ¶ 19). In this role, her salary was $25,000 to $50,000 lower than it would have been if she was a VP; she also managed a lower budget, supervised only two employees, and "performed [fewer] platform activations." (*Id.* ¶¶ 20-21). Ms. Monero allegedly performed well and provided adequate coverage for employees on leave, including Brielle Lintz ("Ms. Lintz"), a White woman and the AVP of Paid Social Media, whom Ms. Monero later determined to be considerably less qualified than herself. (*Id.* ¶¶ 22-24, 26–28). But Ms. Monero was never promoted. (*Id.* ¶ 24).

After hiring Ms. Monero, BPD assigned her "the responsibilities of the Vice President role," without the title or pay, through September 2024. (*Id.* ¶¶ 45-46, 79). She was asked "to perform duties outside of her AVP role[,] . . . including duties involving management across the whole department," which were within the responsibilities of the VP of Digital Media. (*Id.* ¶ 47). More specifically, she was asked to "create processes for digital campaigns, standardize the tracking process after the client audit, contribute to and represent[] client pitch work for all of digital media, serve as the digital lead on client reporting calls, train cross functional staff, onboard clients for digital tasks, and serve as a representative for the entire digital media

team in litigation." (*Id.* ¶ 48). These duties were not assigned to her White peers, such as Ms. Lintz. (*Id.* ¶ 50).

In April 2024, BPD was preparing to deliver a pitch for a new client. (*Id.* ¶ 52). Upper management asked Ms. Monero to help prepare the pitch, and Mr. Donaghue was originally scheduled to present it to the client. (*Id.* ¶ 53). BPD's President asked Ms. Monero to accompany Mr. Donaghue on the pitch because he was less skilled technically and digitally. (*Id.* ¶ 54). Mr. Donaghue initially objected to her attendance, but Ms. Monero was able to attend given her "substantial contributions." (*Id.* ¶ 55). She alleges that she "performed flawlessly" and was "praised [for] her work and level of expertise" by the client. (*Id.* ¶ 56). After the pitch, however, she faced criticism and isolation from Mr. Donaghue. (*Id.* ¶ 57). She alleges that Mr. Donaghue "wanted Black women to be 'seen but not heard' or simply perform the behind-the-scenes work that he could pass off as his own." (*Id.*).

Ms. Monero offers a few examples of Mr. Donaghue's treatment of her. She recounts that Mr. Donaghue criticized her while she was working from home because her one-year-old daughter's arm was "briefly visible" during an internal Zoom meeting. (*Id.* ¶ 58). Mr. Donaghue said that behavior was "unprofessional," but Ms. Lintz and Mollie Cooke (a White woman) routinely showed their children or pets during internal virtual meetings. (*Id.*). Additionally,

Mr. Donaghue refused to speak with Ms. Monero in the office, refused to sit by her at a client presentation at BPD's headquarters, and told Ms. Monero to "stay in her lane." (*Id.* ¶¶ 60-61). Mr. Donaghue allegedly never gave "similar feedback to non-Black leaders who assisted other team members or stepped up to support colleagues." (*Id.* ¶ 62).

In August 2024, BPD hired Katherine Leibold ("Ms. Leibold"), a White woman, as a Media Director. (*Id.* ¶ 64). Like her assessment of Ms. Lintz, Ms. Monero's view of Ms. Leibold was that she was underqualified for her role. (*Id.* ¶¶ 65-66, 69). Mr. Donaghue "recognized that Ms. Leibold was unable to succeed based on her lack of knowledge and took immediate action to support her," including reducing her workload and assigning Ms. Monero, among others, to assist her. (*Id.* ¶ 74). Despite Ms. Leibold's reduced workload, she allegedly struggled to prepare a client presentation; Ms. Monero "stepped up" to support her and help deliver her client presentation. (*Id.* ¶¶ 71-72).

In September 2024, BPD hired Allison Schlappi ("Ms. Schlappi"), a non-Black woman, as VP of Digital Media, at which point Ms. Monero ceased performing VP duties. (*See id.* ¶¶ 79-80). In this role, Ms. Schlappi was Ms. Monero's direct supervisor. (*Id.* ¶ 88). Although Ms. Schlappi had seventeen years of experience, roughly the same amount as Ms. Monero, she did not

have tactical experience, analytics experience, experience across disciplines, nor did she have experience with legal and privacy compliance concerns. (*Id.* ¶¶ 81-83). Ms. Monero had extensive experience in these areas. (*Id.* ¶ 84). Additionally, from Ms. Monero's perspective, Ms. Schlappi did not make any improvements or further develop or train the team during her first six months of employment. (*Id.* ¶ 86). Because Ms. Schlappi lacked experience, Mr. Donaghue brought in other VPs to support her. (*Id.* ¶ 90).

Despite Ms. Monero's requests for additional support and resources, however, Mr. Donaghue did not provide her with any. (*Id.* ¶ 75). By October 2024, Ms. Monero's team was preparing two to four sales briefs per week, even though "[a]n industry-standard is 2-4 per quarter." (*Id.* ¶ 76). Mr. Donaghue also refused to authorize Ms. Monero to hire additional personnel. (*Id.* ¶ 78). In February 2025, one of Ms. Monero's direct reports resigned and Mr. Donaghue denied her request to hire a new direct report. (*Id.* ¶ 92). Mr. Donaghue allowed Ms. Schlappi to hire two direct reports in April 2025. (*Id.* ¶ 93).

In December 2024, Ms. Monero took bereavement leave. (*Id.* ¶ 95). Immediately after Ms. Monero returned to work, Mr. Donaghue provided her with a "formal documentation warning" because a project that she worked on exceeded its budget. (*Id.* ¶¶ 96, 98).

Two other employees, Ms. Leibold and Megan Kangas (a White woman), were responsible for the project's budget and accepted full responsibility, but they were not disciplined. (*Id.* ¶¶ 98–99). It was the first time that Ms. Monero received any indication that she was not meeting expectations. (*Id.* ¶ 97).

A few days after she was issued the warning, Ms. Monero complained to Jordan Benkelman ("Mr. Benkelman"), a Human Resources ("HR") employee, about the "unfair and discriminatory warning." (*Id.* ¶ 100). Mr. Benkelman suggested that Ms. Monero and Mr. Donaghue meet but offered nothing further. (*Id.* ¶ 101). Ms. Monero reached out to Mr. Benkelman again in January 2025, but he did not respond. (*Id.* ¶ 102). Throughout January and February 2025, Ms. Monero was excluded from projects, denied approval to fill the role of her direct report who resigned, and subjected to "adverse terms and conditions of employment." (*Id.* ¶ 103). Mr. Donaghue also waited until January 2025 to respond to a Paid Time Off ("PTO") request Ms. Monero submitted in mid-December. (*Id.* ¶ 104). BPD policy "dictates that PTO requests should normally be responded to within 48 hours," (*id.* ¶ 105), and Mr. Donaghue always timely approved other team members' requests, (*id.* ¶ 106). Because of Mr. Donaghue's delay, Ms. Monero had to cancel plans for her daughter's birthday. (*Id.*).

On March 26, 2025, Ms. Schlappi and Mr. Benkelman presented Ms. Monero with a thirty-day Performance Improvement Plan ("PIP"). (*Id.* ¶ 107). Prior to receiving the PIP, Ms. Monero "had raised concerns about the work of one of BPD's external vendors who was providing questionable and sub-standard work product." (*Id.* ¶ 109). BPD faulted Ms. Monero for "'refusing to work with' the vendor," but she maintains that she "never refused to work with the vendor and was only working to protect BPD and ensure BPD received the best possible work product." (*Id.* ¶ 110).

In April 2025, Ms. Monero "retained legal counsel who articulated claims of race discrimination to BPD on her behalf." (*Id.* ¶ 113). On May 2, 2025, after the PIP ended, BPD terminated Ms. Monero's employment. (*Id.* ¶ 114). BPD explained that "she 'did not meet the requirements of the PIP,'" but did not "giv[e] any concrete examples or explanations." (*Id.*).

On May 6, 2025, Ms. Monero filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging race and gender discrimination.[2] (ECF No. 1 ¶ 10). She received her right-to-sue letter from the EEOC on December 29, 2025. (*Id.* ¶ 11).

[2] Ms. Monero attaches to her complaint the EEOC charge, which appears to have been signed on April 10, 2025. (ECF No. 1-2, at 3).

**B. Procedural Background**

On that same date, December 29, Plaintiff Ms. Monero filed a complaint in this court alleging two counts against Defendant BPD: race discrimination under Title VII, 42 U.S.C. § 1981, and the Maryland Fair Employment Practice Act ("MFEPA") (Count I); and retaliation under Title VII, § 1981, and the MFEPA (Count II). (ECF No. 1). Defendant filed a motion to dismiss on March 2, 2026. (ECF No. 4). Following a notice from this court stating that a response was overdue, (ECF No. 6), Plaintiff filed a response to Defendant's motion to dismiss on April 1, 2026, (ECF No. 7). Defendant replied on April 15, 2026. (ECF No. 8).

## II. Standard of Review

The purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of a complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In determining whether to grant a defendant's motion to dismiss, the court "must accept the complaint's factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025) (citing *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024)). The complaint need only satisfy the standard of Rule 8(a)(2), requiring a "short and plain statement of the claim showing that the pleader is entitled to relief." This showing requires "only

enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays v. Sprinkle*, 992 F.3d 295, 299-300 (4th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint must "'permit[] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679), *aff'd sub nom. on other grounds*, *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012).

**III. Analysis**

Plaintiff brings a number of claims within each of her two counts, and Defendant moves to dismiss all of them. In Count I, five claims of race discrimination are apparent, but only two survive Defendant's motion: the failure-to-promote and formal warning claims. For the other claims in Count I, Plaintiff has failed to allege an adequate comparator. In Count II, there are three possible claims of retaliation, but none will advance because there are insufficient allegations of a causal relationship between Plaintiff's protected activities and the adverse actions taken against her.

**A. Count I: Race Discrimination**

Plaintiff alleges a laundry list of actions Defendant has taken against her that she believes were racially discriminatory under Title VII, the MFEPA, and 42 U.S.C. § 1981. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Likewise, the MFEPA states that "[a]n employer may not fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of the individual's race." Md. Code Ann., State Gov't § 20-606(a)(1)(i). And § 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The Supreme Court of the United States has interpreted this statute "to forbid all racial discrimination in the making of private as well as public contracts." *Ali v. BC Architects Eng'rs, PLC*, 832 F.App'x 167, 170 (4th Cir. 2020) (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987)). This "prohibition extends to

'discrimination in private employment on the basis of race.'" *Id.* (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)). Because "Title VII case law applies to both § 1981 and MFEPA claims," the court will "evaluate[] all three causes of action under Title VII standards." *Gordon v. Holy Cross Hosp. Germantown, Inc.*, 385 F.Supp.3d 472, 477 (D.Md. 2019) (citing *Clarke v. DynCorp Int'l LLC*, 962 F.Supp.2d 781, 788–89 (D.Md. 2013); *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F.Supp.2d 470, 483 n.20 (D.Md. 2013)).

The complaint confusingly lumps many potential claims into Count I, of which five are discernible: (1) "BPD under-leveled and under-paid Ms. Monero"; (2) "BPD denied Ms. Monero adequate support and resources, such as hiring authority"; (3) "BPD issued Ms. Monero an unwarranted and pretextual warning"; (4) "BPD issued Ms. Monero an unwarranted and pretextual . . . PIP"; and (5) "BPD terminated Ms. Monero's employment." (ECF No. 1 ¶¶ 125–27, 129).[3] Based on the facts alleged in the complaint, the court will

[3] Plaintiff also alleges she was subject to disparate criticism, such as when Mr. Donaghue told her that the appearance of her one-year-old daughter's arm on screen during an internal Zoom meeting was "unprofessional." (ECF No. 1 ¶¶ 57–62, 124). But she does not bring a hostile work environment claim or attempt to allege how the criticism negatively affected a term or condition of employment. Accordingly, the court construes her allegations of disparate criticism as intended to support her warning, PIP, and termination claims, rather than to represent a discrete claim.

construe the first claim as a failure-to-promote claim and address it separately, because its elements are slightly different.[4] The other four claims are standard race discrimination claims and will be analyzed together. Only the failure-to-promote and warning claims will advance at this time.

**1. Failure-to-Promote Claim**

Plaintiff alleges that Defendant discriminatorily failed to promote her when it promised her a promotion to the VP position premised on satisfactory performance, she performed satisfactorily, and then Defendant gave the promotion to a less-qualified White individual instead. A failure-to-promote claim is a particular type of discrimination claim with somewhat differently phrased elements than those of a standard race discrimination claim. "In order to properly plead a failure-to-promote claim . . . , a plaintiff must allege specific facts

[4] Plaintiff's complaint suggests several possible claims that arose prior to any discipline she received. Beyond Plaintiff's lack of promotion, Defendant appears to believe Plaintiff's "core" claim is that her hiring as an AVP itself was discriminatory, because Defendant failed to hire her for the VP position for which she was qualified. (ECF No. 4-1, at 6–7). It is also possible that Plaintiff meant to assert an equal pay claim because she allegedly performed the role of VP without the commensurate pay or title. Frankly, it is unclear what claim Plaintiff actually seeks to press, because in her opposition she does not defend her complaint on the ground that it raises a failure-to-promote, discriminatory hiring, or equal pay claim. Given that lack of clarity, the court construes these pre-discipline allegations as raising only a failure-to-promote claim. Plaintiff may move to amend her complaint to raise the other claims in discrete counts.

establishing [the following] four elements" of a *prima facie* case: "'(1) [S]he is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference' of liability." *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (second alteration in original) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 & n.5 (4th Cir. 2004)) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–64 (4th Cir. 1996)). Defendant gives short shrift to this claim, arguing that Plaintiff's belief "she should have been promoted" amounts to nothing more than "disagreement with management decisions" and is not actionable. (ECF No. 4-1, at 8).

On the contrary, Plaintiff's allegations raise the plausible inference that she was discriminatorily denied the VP of Digital Media promotion. The first element is satisfied because Plaintiff is Black. As for the second element, although Plaintiff does not allege that she formally applied for the VP role, this element can be "relaxed" when an actual application was "unrealistic" under the particular circumstances at issue. *See Williams*, 370 F.3d at 431 (quoting *Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 387 (2d Cir. 2000)) (relaxing the second element where the employer failed to notify the plaintiff employee of promotion

opportunities). Here, Plaintiff alleges that she was told during the hiring process that she would be promoted to VP if she successfully covered for several team members who were on leave, and she accepted the AVP role on that basis. (ECF No. 1 ¶¶ 18–19). Accordingly, an actual application was "unrealistic" because Plaintiff's acceptance of the AVP role and subsequent, satisfactory coverage for several team members, (*e.g.*, *id.* ¶¶ 19, 26–32), served as the functional equivalent of an application for the VP role. *See McCaskey v. Henry*, No. 10-cv-390, 2011 WL 2295029, at *4 (W.D.N.C. June 8, 2011) (holding that the second element was met where there was no formal application process but the plaintiff was offered a promotion and she expressed interest in it), *aff'd in part, vacated in part on other grounds*, 461 F.App'x 268 (4th Cir. 2012). Turning to the third element, Plaintiff alleges not only that she was qualified for the VP position, (ECF No. 1 ¶¶ 13, 15–16), but that Defendant required her to perform the duties of the VP position for the first ten months she was on the job, (*id.* ¶¶ 45–48, 79). Finally, the fourth element is satisfied when "an allegedly less-qualified [individual] who was not a member of her protected class received the position." *Stevens v. Cabarrus Cnty. Bd. of Educ.*, 514 F.Supp.3d 797, 816 (M.D.N.C. 2021) (citing *McCaskey*, 461 F.App'x at 270). The position was filled by Ms. Schlappi, a "non-Black"

woman outside Plaintiff's protected class who Plaintiff alleges was less qualified. (*Id.* ¶¶ 80–90). Accordingly, Plaintiff's allegations raise the reasonable inference that she can establish a *prima facie* case of failure to promote.

Defendant resists that conclusion by resorting to the "same-actor inference," which provides that "[w]hen the hirer and firer are the same individual, there is a powerful inference . . . that discrimination did not motivate the employer." (ECF No. 4-1, at 7 n.1 (quoting *Proud v. Stone*, 945 F.2d 796, 797–98 (4th Cir. 1991))). The United States Court of Appeals for the Fourth Circuit has extended that inference to situations in which the hirer and the decisionmaker regarding a promotion are the same individual. *Evans*, 80 F.3d at 959; *Taylor v. Va. Union Univ.*, 193 F.3d 219, 231 (4th Cir. 1999) (en banc), *abrogated on other grounds by*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). But application of the same-actor inference here is premature. In *Proud*, the Fourth Circuit was quite explicit that this inference "comes at the third stage of the [*McDonnell-Douglas*] analysis" and "creates a strong inference that the employer's stated reason for acting against the employee is not *pretextual*." 945 F.2d at 798 (emphasis added). Plaintiff can survive a motion to dismiss if she plausibly pleads a *prima facie* case; whether the legitimate, nondiscriminatory reason Defendant offers is pretextual is a question for another

day. Because Plaintiff has satisfied the pleading standard, her failure-to-promote claim under Title VII, § 1981, and the MFEPA will not be dismissed.

**2. Other Discrimination Claims**

All but one of the other claims in Count I, however, fail in their current form. Because Plaintiff's allegations do not suggest direct evidence of racial discrimination, she proceeds on the basis of circumstantial evidence, which courts generally analyze under the rubric of a *prima facie* case. "[T]he elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190 (italics added) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). But a plaintiff need not "plead facts that constitute a *prima facie* case in order to survive a motion to dismiss," *id.* (italics added) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15 (2002)); instead, she "can survive a motion to dismiss a Title VII claim if she simply presents allegations sufficient to reasonably infer a *prima facie* case of discrimination," *Niederberger v. Wegmans Food Mkts., Inc.*, No. 23-cv-2759-JKB, 2024 WL 2866609, at *3 (D.Md. June 6, 2024)

(italics added) (quoting *Walton v. Greensville Corr. Ctr.*, No. 14-cv-628, 2015 WL 2452451, at *10 (E.D.Va. May 21, 2015)).

Defendant does not dispute that the first two elements are met. Instead, it argues that Plaintiff has failed to allege an adequate comparator for her remaining four claims.[5]

When a plaintiff presents a claim of discrimination by comparison to employees outside her protected class, she must plausibly allege that those comparator employees are "similarly situated in all material respects." *Tinsley v. City of Charlotte*, 854 F.App'x 495, 500 (4th Cir. 2021) (citing *Spencer v. Va. State Univ.*, 919 F.3d 199, 207–08 (4th Cir. 2019); *Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019)). "While there is no

[5] Defendant also belatedly contends that the inadequate support/resources and formal warning are not adverse actions. (ECF No. 8, at 4–5, 5 n.1). In its motion to dismiss, Defendant's argument regarding adverse actions was limited to Plaintiff's retaliation claim in Count II. It only expanded its argument to cover some of the alleged adverse actions regarding the race discrimination claims in Count I in its reply brief. Although some of the actions are the same, the standard to assess whether an action is adverse is different for retaliation as opposed to discrimination. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–58 (2024). Because Defendant did not raise the Count I adverse action argument in a timely manner, Defendant has forfeited that argument. *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("Generally, 'new arguments cannot be raised in a reply brief' before the district court." (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013))). Even if the court did consider the argument, it is not compelling as articulated. Defendant's attack on inadequate support/resources appears to be a legitimate, nondiscriminatory reason dressed up as an adverse action argument, and its attack on the formal warning rests on outdated case law.

'bright-line' rule for what makes two comparators 'similar' for purposes of Title VII claims, courts consider 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Johnson v. Balt. City*, 163 F.4th 808, 815 (4th Cir. 2026) (quoting *Spencer*, 919 F.3d at 207) (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019); *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381 (4th Cir. 2022)). When a plaintiff complains of discriminatory discipline, her comparators "should have engaged in the same basic misconduct and share a similar disciplinary history." *Tinsley*, 854 F.App'x at 504 (citing *Lewis*, 918 F.3d at 1227).

**a. Inadequate Support and Resources**

Plaintiff alleges that some of her White coworkers struggled with their jobs and that Mr. Donaghue readily provided them with support, but that he denied her the same support when she excelled in her job but dealt with an unusually demanding workload. Specifically, she points to Ms. Schlappi and Ms. Leibold as comparators. Neither one supports an inference of discrimination against Ms. Monero.

Beginning with Ms. Schlappi, VP of Digital Media, she was not similarly situated in all material respects. Mr. Donaghue allegedly brought in other VPs to support her due to her lack of experience, and in April 2025, Mr. Donaghue allowed her to hire two new direct reports. (ECF No. 1 ¶¶ 90, 93). By October 2024, Ms. Monero and her team were "preparing 2-4 sales briefs for clients per week," whereas "industry-standard is 2-4 per quarter." (*Id.* ¶ 76). Despite this heavy workload, Mr. Donaghue "refused to provide support and resources," including "refus[ing] to authorize any additional hiring for Ms. Monero's team" until each of her team members were working 60-hour weeks. (*Id.* ¶¶ 77–78). Although Ms. Monero had performed the duties of Ms. Schlappi's role before Ms. Schlappi was hired, she was subordinate to Ms. Schlappi after Ms. Schlappi was hired. They had different job titles and descriptions: Ms. Schlappi, as VP of Digital Media, managed six individuals, a considerably larger budget, and more platform activations, while Ms. Monero, as AVP of Paid Search, managed two individuals, a much smaller budget, and fewer platform activations. Accordingly, Ms. Schlappi's requests for support, and her hiring authority in particular, cannot be compared to Ms. Monero's requests for support and hiring authority. Moreover, the reason for Ms. Schlappi's support was allegedly her inexperience, which differs meaningfully from Ms. Monero's stated reason that

she needed support because of an unusually heavy workload. Thus, Mr. Donaghue's differential treatment of Ms. Schlappi does not raise an inference of discrimination.

Plaintiff's resort to Ms. Leibold fares not better. Ms. Leibold was hired to be the Media Director, for which she was allegedly inexperienced. (*Id.* ¶¶ 64–65). Mr. Donaghue allegedly recognized Ms. Leibold's inexperience, reduced her workload, and assigned other team members, including Ms. Monero, to support her. (*Id.* ¶ 74). Again, Ms. Leibold held a different job than Ms. Monero, and Ms. Monero does not explain how the Media Director position related to her AVP position within the BPD hierarchy. Apart from an allegation that Ms. Monero helped Ms. Leibold with a client presentation, (*id.* ¶ 74), it is unclear how their respective roles compared. And just as with Ms. Schlappi, the purported reason Ms. Leibold required support, her inexperience, differs from Ms. Monero's need for support due to a heavy workload. Therefore, Ms. Leibold is not a viable comparator for this claim.

Plaintiff's inadequate support/resources claim will be dismissed.

**b. Formal Warning**

Plaintiff next alleges that the formal warning she received in December 2024 was discriminatory. The warning related to a project that exceeded its set budget. (*Id.* ¶ 98). Ms. Leibold

and Ms. Kangas were responsible for managing the project's budget and took responsibility for their mistakes. (*Id.* ¶¶ 98–99). Nevertheless, neither woman was disciplined for those mistakes, and instead Ms. Monero was disciplined. (*Id.* ¶ 99).

With respect to the discipline stemming from this project, Plaintiff alleges enough to raise a plausible inference of discrimination. Ms. Leibold, although not similarly situated with respect to the previous claim, is similarly situated enough here because she worked on the same project as Ms. Monero and took responsibility for the very mistake that led to Ms. Monero's warning. The same goes for Ms. Kangas. And the difference in job responsibilities only weighs in favor of the discrimination inference, because Ms. Monero was allegedly blamed for her comparators' failure to meet *their* responsibilities, rather than for her failure to meet her *own* responsibilities.

The formal warning claim will not be dismissed.

**c. PIP and Termination**

Finally, Plaintiff alleges that she was discriminatorily put on a PIP and then terminated. On March 26, 2025, she was put on a 30-day PIP, in which Defendant accused her of refusing to work with an external vendor, among other unspecified criticisms. (*Id.* ¶¶ 107–10). Plaintiff disputes whether she refused to work with the external vendor but does acknowledge that she raised concerns

about the quality of the external vendor's work product. (*Id.* ¶¶ 109–10). On May 2, "at the conclusion of the 30-day PIP," she was terminated because she "did not meet the requirements of the PIP." (*Id.* ¶ 114). None of the possible comparators—Ms. Schlappi, Ms. Lintz, Ms. Cooke, Ms. Leibold, Ms. Kangas, or Mr. Lorton—is adequate. As for the first five, Plaintiff does not allege any misconduct by them similar to refusing to work with or complaining about an external vendor. The only one who held the same title of AVP, Ms. Lintz, (*id.* ¶ 26), did no more than have her children and/or pets appear on her Zoom screen during internal meetings, (*id.* ¶ 58). Plaintiff was criticized for the same conduct, but she was not disciplined for it. (*See id.*). Accordingly, Ms. Lintz was not similarly situated to the extent Plaintiff seeks to compare Ms. Lintz's Zoom conduct to Plaintiff's vendor relationships, and she was not differently treated as to discipline for her Zoom conduct.

The sixth possible comparator, Mr. Lorton, requires a little more discussion. He had held the VP of Digital Media role until February 2023. (*Id.* ¶¶ 36, 44). Plaintiff provides one concrete example of Mr. Lorton's misconduct: Due to poor advice he gave to a client, the client was sued. (*Id.* ¶ 37). Despite Mr. Lorton's error, Mr. Donaghue continued to support and defend him. (*Id.* ¶ 39). BPD terminated Mr. Lorton in February 2023 after he

"repeatedly engaged in sexual misconduct and drunk and disorderly conduct in front of coworkers and clients." (*Id.* ¶ 44). Plaintiff contends that Mr. Lorton engaged in serious misconduct by causing a client to be sued, but he was not disciplined, and he was later terminated only because of his sexual and drunken misconduct. (ECF No. 7, at 7–8). Even assuming that his misconduct resulting in client litigation is comparable to Plaintiff's vendor issues, there are several problems with using Mr. Lorton as a comparator. First, he held a different position than Plaintiff. Although Plaintiff allegedly did perform the duties of VP of Digital Media through September 2024, (*see* ECF No. 1 ¶ 79), her rocky relationship with the external vendor does not appear to have occurred until early 2025, (*id.* ¶¶ 107–10), at which time she was no longer performing VP duties. Second, Mr. Lorton *was* terminated, and Plaintiff offers no timeline of events to discern how much time passed between his actions that resulted in the client being sued and his sexual and drunken misconduct. Without any such timeline, it is difficult to infer that Mr. Lorton's termination was unrelated to the client litigation he caused. Due to these problems, Mr. Lorton is not a helpful comparator.

Plaintiff's PIP and termination claims will be dismissed.

**B. Count II: Retaliation**

Plaintiff’s Count II raises several retaliation claims under Title VII, the MFEPA, and 42 U.S.C. § 1981. Title VII prohibits an employer from “discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].” 42 U.S.C. § 2000e-3(a). The MFEPA contains an almost-verbatim prohibition on retaliation. Md. Code Ann., State Gov’t § 20-606(f). Section 1981 likewise “encompasses claims of retaliation.” *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). And where, like here, the plaintiff does not allege direct evidence of retaliation, courts generally assess the retaliation claims against the elements of a *prima facie* retaliation claim. *Connelly v. Guilford Cnty. Schs.*, No. 24-cv-492, 2025 WL 551896, at *6 (M.D.N.C. Feb. 19, 2025) (noting that, although a plaintiff need not plead a *prima facie* case of retaliation, “the Fourth Circuit (recently and repeatedly) has relied on decisions rendered on summary judgment that analyze the prima facie elements of a retaliation claim” to “determin[e] whether a complaint plausibly stated a claim for retaliation” (collecting cases)). The elements are the same for Title VII, MFEPA, and § 1981 retaliation claims.

*Magassouba v. Prince George's County*, 773 F.Supp.3d 196, 221 (D.Md. 2025) (citing *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004); *Barreto v. SGT, Inc.*, 826 F.App'x 267 (4th Cir. 2020)). Those elements are: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Id.* (quoting *Coleman*, 626 F.3d at 190).

Plaintiff alleges that she engaged in two instances of protected activity: (1) her complaint to HR employee Mr. Benkelman in December 2024 that the formal warning was discriminatory, and (2) her retention in April 2025 of legal counsel, who communicated claims of race discrimination to Defendant. She then identifies two adverse actions Defendant took: (1) the PIP, and (2) the termination. Defendant does not contest that Plaintiff's two actions constituted protected activities, or that the termination constituted an adverse action.

Defendant does argue briefly that the PIP was not an adverse action, but under the wrong standard. (ECF No. 4-1, at 10–11). To rise to the level of an adverse action, a retaliatory action must be "'materially adverse,' meaning that it causes 'significant' harm." *Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In other words, the action must be "serious

enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (alteration in original) (quoting *White*, 548 U.S. at 68). True, courts in this district have said that the issuance of a PIP on its own does not constitute an adverse action in a retaliation claim. *E.g.*, *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F.Supp.2d 480, 492 (D.Md. 2013) (citing *Rock v. McHugh*, 819 F.Supp.2d 456, 470–71 (D.Md. 2011)). But courts in this circuit have held that a PIP that "was actually implemented," and which "imposed conditions with which [the employee's] failure to comply ultimately led to termination of employment," could "dissuade a reasonable employee from making a charge of discrimination." *Emami v. Bolden*, 241 F.Supp.3d 673, 685 (E.D.Va. 2017); *accord Marley v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, No. 17-cv-1902-GJH, 2018 WL 4509900, at *7 (D.Md. Sep. 20, 2018) (concluding that the plaintiff plausibly pleaded a retaliatory adverse action where the defendant placed the plaintiff on a PIP and threatened to terminate him). Here, Plaintiff's PIP was actually implemented and appeared to carry the threat of termination if she did not comply with its conditions. (*See* ECF No. 1 ¶ 114 ("[A]t the conclusion of the 30-day PIP, BPD terminated Ms. Monero's employment, vaguely stating she 'did not meet the requirements of the PIP.'")). Plaintiff has alleged enough to raise the plausible inference that the PIP and its

implementation could dissuade a reasonable employee from making a charge of discrimination.

Finally, Defendant focuses its challenge to Plaintiff's retaliation claim on the causation element. To support causation, a plaintiff must allege at least that "the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F.Supp.2d 649, 655 (D.Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803–04 (4th Cir. 1998); *Dowe v. Total Action against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). The knowledge requirement means that "the decisionmaker imposing the adverse action [must] have actual knowledge of the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021). A plaintiff can allege causation through relevant facts, temporal proximity alone if the adverse action is "very close" in time to the protected activity, or otherwise temporal proximity in conjunction with relevant facts. *Id.* at 123, 127 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). "While there is no bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months." *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025)

(citing *Roberts*, 998 F.3d at 127). If temporal proximity is absent, a plaintiff can still allege causation "through a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity." *Id.* (collecting cases). Importantly, "[e]mployers need not suspend previously planned [adverse actions] upon discovering that" the employee has engaged in protected activity. *See Breeden*, 532 U.S. at 272.

Based on the timeline provided, there are three causal relationships to consider: (1) the HR complaint and the PIP, (2) the HR complaint and the termination, and (3) the retention of counsel and the termination.[6] Defendant argues the first two lack sufficient temporal proximity or other relevant indicia of causation, (ECF No. 4-1, at 12), and that the third does not raise an inference of causation because Plaintiff's termination was already contemplated before she retained counsel, (*id.* at 12–13). Defendant is correct, and the retaliation claims will be dismissed.

Beginning with the HR complaint's relationship to the PIP and termination, the causal inference is too weak. First, the only individual Plaintiff alleges knew about her HR complaint was Mr. Benkelman, the HR employee to whom she complained. Both Ms. Schlappi and Mr. Benkelman presented the PIP to Plaintiff, and it

---

[6] Because the PIP preceded Plaintiff's retention of counsel, her retention of counsel cannot have caused the PIP.

is unspecified who terminated Plaintiff. According to the complaint, then, the only individual associated with either adverse action who had actual knowledge of Plaintiff's HR complaint was Mr. Benkelman. But Plaintiff does not allege that Mr. Benkelman was involved in the decision to issue her the PIP, as opposed to merely being present for its issuance as an HR representative. Therefore, Plaintiff has failed to allege actual knowledge by a decisionmaker.

Second, three months passed between the HR complaint and the PIP, and more than four months passed between the HR complaint and the termination. Such a period of time is "sufficiently long so as to weaken significantly the inference of causation," *Roberts*, 998 F.3d at 127 (quoting *Horne v. Reznick Fedder & Silverman*, 154 F.App'x 361, 364 (4th Cir. 2005)), and require allegations of "a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity," *Barnhill*, 138 F.4th at 132. She points to her exclusion from projects, the denial of her request to fill a vacancy among her direct reports, and a delay in response to one of her PTO requests. (ECF No. 1 ¶¶ 103–04). But these additional allegations fail to generate a causal inference for two reasons. To the extent she attributes these actions to Mr. Donaghue, she does not allege that Mr. Donaghue knew about her protected activity. And these allegations represent a

continuation of actions that began long before her December 2024 HR complaint. For example, Mr. Donaghue allegedly began to "isolat[e] her" in April 2024, (*id.* ¶ 57), and Mr. Donaghue "refused to authorize any additional hiring for Ms. Monero's team" in or around October 2024, (*id.* ¶¶ 76–78). Similar actions taken after her HR complaint, then, do not "indicat[e] disdain for or intermeddling with the protected activity." *Barnhill*, 138 F.4th at 132.

The causal inference is also too weak between Plaintiff's retention of counsel and her termination, even though the two events are temporally proximate. Again, Plaintiff does not specify to whom at BPD her retention of counsel and assertion of discrimination claims was communicated, nor does she specify who at BPD terminated her. Without such information, it is difficult to infer actual knowledge of her protected activity by the decisionmaker. More importantly, however, Plaintiff's allegations indicate that, at the time of her protected activity in April 2025, her termination was already contemplated if she did not meet the requirements of her PIP issued in March 2025. (*See* ECF No. 1 ¶¶ 113–14). "[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Breeden*, 532 U.S. at 272. Absent allegations that Plaintiff was meeting the requirements of her PIP, and thus any

planned termination had been effectively "suspend[ed]," *id.*, a causal relationship between Plaintiff's protected activity and her termination cannot be inferred.

Because Plaintiff has failed to state a retaliation claim, Count II will be dismissed.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss will be granted in part as to the inadequate support/resources, PIP, and termination claims in Count I, and as to Count II in its entirety. Defendant's motion to dismiss will be denied in part as to the failure-to-promote and formal warning claims in Count I. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge